## John. Speer *v.* The State.

1. Confessions are divided, by elementary writers, into two classes: First, judicial confessions, made before a magistrate or court, in the course of legal proceedings; and, second, extrajudicial confessions, or those made elsewhere than before a court or magistrate. This latter class embraces, not only express confessions, but also all admissions from which guilt may be inferred.

2. Same. — In ruling upon the admissibility of a confession, the material inquiry, subject to the provisions of our Code, is whether it was made voluntarily, or was obtained by the influence of hope or fear, of a temporal nature, applied by a third person to the prisoner's mind. This inquiry is for the determination of the judge presiding at the trial, in view of the age, situation, and character of the accused, and of the circumstances under which the confession was made.

3. Same — Case Stated. — In a trial for murder, the court below ruled to be admissible a confession made by the accused to two persons who were accompanying him on his way to give himself up; but, in its charge to the jury, instructed them to disregard the confesssion if they believed that the accused, when he made it, was restrained of his liberty by the persons who were with him. *Held*, that this instruction, if erroneous, was not to the prejudice, but to the advantage, of the accused.

Appeal from the District Court of McLennan. Tried below before the Hon. L. C. Alexander.

This is the second appeal from capital convictions of the accused for the murder of J. S. Pledger, which was committed on July 14, 1875. The first conviction was reversed by this court at its Austin term, 1877, on questions of practice. See 2 Texas Ct. App. 246.

The evidence makes a clear case of the unmitigated assassination of an old man, but the record fails to disclose the motive or the object of the crime. He was shot down while plowing in his own field. His son, F. M. Pledger, was also plowing in the field, and was only about ten steps from his father at the moment the gun fired. He testified at the trial, for the State, that, as his father approached the end of the row, the accused shot him from the other side of the fence. Witness noticed the accused as he presented his gun, and shouted to his father to warn him, but the warning was too late. This witness saw the accused distinctly, and fully recognized him as the assassin. After shooting, the accused ran off across a neighboring field. Tall weeds grew on each side of the fence where the accused stood when he shot, but they had been broken off and mashed down so as to allow a clear view of the deceased as he approached the end of the row.

By other witnesses it was proved that a hat belonging to the accused was picked up at the spot where he, according to the first witness, passed into the neighboring field. Tracks, also, corresponding with his shoes, were traced through freshly-ploughed ground up to a point in the neighboring field, where a man named Wilson was plowing on the same day. This man Wilson disappeared immediately from the country, and the effort of the defense seemed to be to lay the deed on him. But it is seldom, if the witnesses are to be believed, that a deliberate assassination is so clearly fastened on a defendant as the testimony in this case fastens the immediate perpetration of this one upon the appellant, whoever else may have been his instigators or accomplices.

*Herring, Anderson & Kelley*, for the appellant.

*George McCormick*, Assistant Attorney-General, for the State.

WINKLER, J.  The appellant was indicted and tried for the murder of one J. S. Pledger, alleged to have been committed in the county of McLennan, on July 14, 1875.  On the trial below the jury found the accused guilty of murder in the first degree, and he was so adjudged by the court, the punishment being affixed by the verdict and judgment at death by hanging.

The most important inquiry presented by the record, and in the brief and oral argument of the counsel for the appellant, and concerning which the only bill of exceptions was reserved on the trial, arises out of the ruling of the court admitting in evidence to the jury certain confessions made by the accused to the witness Autry, and testified to by him on this trial, under the circumstances under which the confession was made and the condition in which the accused was placed at the time, as disclosed by the witness.

The confession was made in answer to a question propounded to the accused, and under the following circumstances, as detailed substantially in the bill of exceptions, and set out at length in the statement of facts.  The witness had heard of the killing, and that the defendant had done the killing, or was accused of it.  On the night of the day on which the homicide was committed, and at about nine or ten o'clock, while the witness Autry was in his house, situated about one mile from Mudtown, and about three or four miles from where the defendant lived, the witness heard some one whistle near the house, and requested one McIntosh, who was then living at the house of the witness, to go out and see who it was that had whistled.  McIntosh went out, and returned and said that it was the defendant, calling his name, who said he wanted to see the witness, Autry ; and here the witness details what followed, in this language : "I and McIntosh went out to where Speer was, and I said, ' Johnnie, what do you want? ' and defendant, John Speer, said, ' I want something to eat, and

some water.'   I said to Johnnie, 'You had better surren-
der; a great many men are hunting for you.'   I reached out
my hand and took Johnnie's gun; it was a double-barrel
shot-gun; he released the gun as soon as I took hold of the
gun.   I turned round and took the gun in the house, and
Speer, defendant, followed me in the house.   McIntosh
also went into the house, in advance of me.   John. Speer,
the defendant, told me that he had been to Mudtown to give
himself up, but saw such a number of persons there that he
was afraid to give himself up, fearing he might be injured.
When I went into my house, after going out to see Speer,
I put the gun under my bed, in the same room we went
into; I did not notice whether the gun was loaded or not.
" After I put the gun under the bed, I got my horse and
rode over to Rash Harris' house, about a mile distant.   I
came back.   When I left my house I left defendant, Speer,
and McIntosh in the same room together.   I was not armed,
and McIntosh was not armed, during any of the time we
were with Speer, the defendant, nor at any other time that
night.   After I got back home from Harris' house, McIn-
tosh and Speer, defendant, started to Mudtown; they went
on foot.   I started on toward Mudtown and passed them,
defendant and McIntosh, about a hundred yards from my
house.   The purpose of going to Mudtown was for de-
fendant, Speer, to give himself up to some persons at Mud-
town.   I was not an officer of any kind, and McIntosh was
not an officer, nor was Harris an officer.   I knew Speer, de-
fendant, well, and he knew me well; we were friendly.   As
I passed defendant, Speer, and McIntosh, on their way to
Mudtown, I said to defendant, 'Johnnie, did you kill old
man Pledger?'   Johnnie said to me, 'Yes.'   I asked him,
'Why did you do it, Johnnie?' and Johnnie said, 'I had to
do it.'   I then passed them and went on to Mudtown, and
the next time I saw Johnnie, defendant, he was lying
down behind a house, near a well, at Mudtown, and was

then taken into custody by some persons there.'' In answer to a question put to the witness, Autry, as to what he said to McIntosh when they started out of the house where Speer, the defendant, was, the witness said, '' I said, let's go and arrest him.''

During the examination of the witness Autry, the bill of exceptions states, '' a witness, Autry, was sworn for the State, by whom it was proposed to prove certain statements made by defendant to him, Autry, and the defendant, by his counsel, interposed, stating that it would appear that at the time of such statements the defendant was in arrest, whereupon the witness was examined, and stated,'' etc. ; and following with the testimony of the witness, as taken above from the statement of facts.

We here quote, again, from the bill of exceptions :

'' When witness passed defendant and McIntosh, *en route* to Mudtown, he asked defendant, ' Did you kill old man Pledger?' to which defendant replied, ' Yes.' Witness asked, ' Why did you do it?' to which he replied, ' I had to do it.' To the answers to these two last questions defendant objected, claiming that defendant was in arrest at the time ; which objection was overruled by the court, because it appeared that defendant made said statements voluntarily, and it did not appear that at the time the defendant was under restraint or in custody, and said testimony was admitted ; and the question of restraint or custody at the time of said answers was, nevertheless, submitted to the jury by the charge ; to which ruling of the court, admitting said evidence, defendant then and there excepted,'' etc.

Whilst it will be seen that, by the bill of exceptions, it was the admission of the testimony which was objected to, still, in the assignment of errors and in argument, the objection is presented in a two-fold sense : first, that it was error to allow the testimony to go to the jury at all, for the

reasons stated in the bill of exceptions; and, second, that it was error in the court in submitting to the jury the question as to whether the defendant was in restraint or custody at the time of making the admissions contained in the answers of the witness objected to.

Confessions, say the elementary writers, are divided into two classes — judicial and extrajudicial.

" Judicial confessions are those which are made before the magistrate, or court, in the due course of legal proceedings." "*Extrajudicial confessions* are those which are made by the party elsewhere than before a magistrate, or in court; this term embracing, not only explicit and *express* confessions of crime, but all those admissions of the accused from which guilt may be *implied*. All confessions of this kind are receivable in evidence, being proved like other facts, to be weighed by the jury." 1 Greenl. on Ev., sec. 216, 6th ed.; Roscoe's Cr. Ev. 37. It is the latter class — *extrajudicial* confessions — with which we have to deal in the present case. We may remark, further, that the effect of this kind of testimony, or the weight or degree of credit to which it is entitled, does not arise in the present case; the sole question is as to its admissibility.

We hazard nothing by saying that, as a general rule, confessions of guilt, freely and voluntarily made, are admissible against the accused, and that confessions not so voluntarily made are, as a general rule, not admissible. As was said by Eyre, C. B., in Warickshall's case, cited in 1 Greenl. on Ev., sec. 219, " a free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and, therefore, is admitted as proof of the crime to which it refers; but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape, when it is to be considered as evidence of guilt, that credit ought not to be given to it, and, therefore, it is rejected."

Says Mr. Greenleaf: "The material inquiry, therefore, is whether the confession has been obtained by the influence of hope or fear, applied by a third person to the prisoner's mind. The evidence to this point, being in its nature preliminary, is addressed to the judge, who admits the proof of the confession to the jury, or rejects it, as he may or may not find it to have been drawn from the prisoner by the application of those motives. This matter, resting wholly in the discretion of the judge, upon all the circumstances of the case, it is difficult to lay down particular rules, *a priori*, for the government of that discretion. The rule of law, applicable to all cases, only demands that the confession shall be made voluntarily, without the appliances of hope or fear by any other person; and whether it was so made or not is for him to determine, upon consideration of the age, situation, and character of the prisoner, and the circumstances under which it was made. Language addressed by others, and sufficient to overcome the mind of one, may have no effect upon that of another — a consideration which may serve to reconcile some contradictory decisions, when the principal facts appear similar in the reports — but the lesser circumstances, though often very material in such preliminary inquiries, are omitted. But it cannot be denied that this rule has been sometimes extended quite too far, and been applied to cases where there could be no reason to suppose that the inducement had any influence upon the mind of the prisoner." 1 Greenl. on Ev., sec. 219.

The conclusions arrived at by the author seem to be supported by numerous adjudicated cases. He says, in a note to the section quoted above: "The cases on this subject have recently been very fully reviewed in *Reg.* v. *Baldry*, 16 Jur. 599 [decided in the Court of Criminal Appeals, April 24, 1852]. In that case, the constable who apprehended the prisoner, having told him the nature of the charge, said 'he need not say anything to criminate him-

self; what he said would be taken down and used as evidence against him ;' the prisoner thereupon having made a confession, the court held the confession admissible." Parke, B., is quoted as having said : " By the law of England, in order to make a confession admissible in evidence, it must be perfectly voluntary ; and there is no doubt that any inducement, in the nature of a promise or of a threat, held out by a person in authority, vitiates the confession. The decisions to that effect have gone a long way. Whether it would not have been better to have left the whole to go to the jury is now too late to inquire ; but, I think, there has been too much tenderness towards prisoners in this matter. I confess that I cannot look at the decisions without some shame, when I consider what objections have prevailed to prevent the reception of confessions in evidence ; and I agree with the observation that the rule has been extended quite too far, and that justice and common sense have too frequently been sacrificed at the shrine of mercy." Lord Campbell, C. J., stated the rule to be, that " if there be any worldly advantage held out, or any harm threatened, the confession must be excluded ;" in which the other judges concurred.

In *The Queen* v. *Johnson*, Easter term, 1864, reported in 2 Leading Criminal Cases, 2d ed., 504, M. J., suspected of having committed a felony, was followed and stopped by a constable in plain clothes. The constable, having told M. J. what he was, and that she (M. J.) was charged with felony, proceeded to put several questions to her relative to a parcel in her hand, which contained the goods supposed to have been stolen. At the time he asked the questions the constable had not told M. J. that she was under arrest, " but he would not let her go." He did not expressly hold out any threat or inducement to M. J., nor did he, before she answered him, give her any caution. M. J. having answered the questions, the constable then told her she was not bound to say anything that would criminate herself, and

said he should bring her to the police office. *Held*, by eight judges, that the conversation between M. J. and the constable was receivable in evidence, and by three judges that it was not so receivable. This is a very instructive case, and cites quite a number of other English cases on the subject we are now investigating.

We make this extract from the opinion in Johnson's case: " That the rule thus laid down does not operate to exclude statements made by accused persons in answer to questions put to them, whether by persons in authority or by others, though not preceded by any caution, has been repeatedly decided, and, unless those decisions are now to be overruled, we cannot yield to the objection made to the admission of the statements of the prisoner in the present case. Thus, in Gibney's case, which is reported in Jebb's Reserved Cases, page 15, the prisoner was taken into custody upon a charge of having murdered his child. The constable who was taking him to jail said he held out no hopes to the prisoner, nor used any threat. He said to him, ' You must be a very unhappy boy, to have murdered your own child, if it be the case.' The prisoner was crying very severely, and the constable then said, ' Did you kill the child?' in answer to which the prisoner made a full confession. The admissibility of this, and of another confession to another constable, being considered, all the judges being present, it was their unanimous opinion that the confession was properly received. ' Some of the judges,' Mr. Jebb says, ' had doubts, but they finally concurred with the rest. They held the rule to be well established that a voluntary confession shall be received in evidence; but, if hope has been excited, or threats or intimidation held out, it shall not. The fear, however, to be produced must be of a temporal nature, and in this case there was no such threat or intimidation, nor any fear of a temporal nature produced.' "

Agreeably to Mr. Archbold, " a confession by the defendant, if obtained fairly, and without holding out any inducement to him to make it, is nearly the strongest evidence that can be given of the facts stated in such confession against the party making it, and is abundantly sufficient of itself, without any confirmation, to warrant a verdict against him." 1 Arch. Crim. Pr. & Pl. 125. But, the fact must not be overlooked that there are cases where the confession has been held insufficient unless upon the proof of the *corpus delicti*, and with us this is setttled by statute.

The Texas Code of Criminal Procedure provides, in article 661:

" The confession of a defendant may be used in evidence against him, if it appear that the same was freely made, without compulsion or persuasion, under the rules hereafter prescribed.

" Art. 662. The confession shall not be used if, at the time it was made, the defendant was in jail, or other place of confinement, nor while he is in custody of an officer, unless such confession be made in the voluntary statement of the accused, taken before an examining court, in accordance with law, or be made voluntarily, after having been first cautioned that it may be used against him ; or unless, in connection with such confession, he make statement of facts or of circumstances that are found to be true, which conduce to establish his guilt — such as the finding of secreted or stolen property, or instruments with which he states the offense was committed." Pasc. Dig., arts. 3126, 3127.

It is believed that the restrictions thrown around the admission of confessions as evidence against the person making them mentioned in article 662 of the Code, as above set out, and which are referred to in the latter clause of the preceding article, in the expression, " under the rules here-

after prescribed," have reference to what the elementary writers denominate *judicial confessions,* whilst the confessions mentioned in article 661 belong to the other class, denominated *extrajudicial confessions.*

In *Warren* v. *The State,* 29 Texas, 369, relied on by appellant's counsel, the confession, agreeably to the report of the case, was obtained under the following circumstances:

"The evidence was that Engleke had become aware that some one was in the habit of entering his store and robbing it. He placed two witnesses in the store to watch at night. Some person entered by a trap-door, and opened the money-drawer. They struck a light, and the intruder fled. One of the witnesses ran rapidly to Engleke's house — 400 yards. A few moments after his arrival, the negro, who was Engleke's servant, entered, out of breath, and said to Engleke, 'Two white men have broke into the store.' Engleke charged the defendant with being the thief. Several persons soon entered, with six-shooters, and the negro was taken into the counting-room. He said to Engleke that if they would not hang him he would confess the whole business. Engleke having given the promise, he confessed to the habit of entering the store, and that at different times he had taken out, in all, as much as $75, besides some calico and tobacco; and he offered to work it all out." The court, on appeal, held the confession inadmissible, saying: "The evidence in this case shows that the confession was made when the defendant was in fear that his life might be taken. A statement made under such circumstances cannot be regarded as voluntary." In this we most heartily concur. The difference between that case and the present is, however, too marked to escape observation.

In all the cases to which we have had access, in which the confessions were held to be inadmissible, the reason for excluding it is found to be that the confession was induced and influenced by means of either hope or fear operating

upon the mind of the accused at the time the confession was made, or when the influence had been brought to bear before and continued to operate at the time of making the confession ; whilst, on the other hand, no authority is found for excluding an extrajudicial confession, freely and voluntarily made ; and, agreeably to the authorities, all such confessions are regarded as voluntary unless influenced by hope or fear of a temporal character.

With reference to the confession we are here considering, and the circumstances under which it was made, there is but a single expression tending to show that the defendant was in arrest at the time the confession was made, and that is the proposition made by the witness Autry to McIntosh, when it was ascertained that the whistle came from the defendant, and the advice given to him by the witness, and his taking the defendant's gun. The evidence does not show that these parties attempted a formal arrest, or that their action was so understood by the accused. On the contrary, the evidence tends to show that the accused had sought the house of the witness as that of a friend, for advice and assistance, and not improbably to arrange for placing him in the custody and under the protection of the law.

It is shown that the witness Autry and the man McIntosh were not officers of the law, nor was the man Harris, to whose house the witness went whilst the accused was at the house of the witness Autry. It is not shown that the accused believed, or was induced to believe, that he was in custody of an officer, or that he was restrained in any manner by the only two persons with whom it is shown he was in contact ; and the very expression of the witness, that when the defendant and McIntosh started to Mudtown the defendant was to *give himself up to some person or persons at Mudtown*, tends strongly to show that the accused was not regarded as being under arrest at the time the confession was made. Other expressions in the evidence tend in the

same direction. The evidence does not show that, at the time the confession was made, the accused was in jail or other place of confinement, or in the custody of an officer, or any person having or assuming authority over him, or that he had any reason to believe possessed any authority over him.

Again, there is nothing in the evidence tending, even remotely, to show that at the time the confession was made any inducement whatever was held out to the accused to make the confession. No threat or promise, no influence whatever is shown, or anything tending to influence the mind of the accused in any manner, at the time or prior thereto, or tending to show that the confession was not freely made, without compulsion or persuasion. We are, therefore, of opinion that the confession, under the circumstances surrounding the accused at the time it was made, was clearly admissible under the law, and that the court did not err in permitting it to go to the jury as evidence in the case.

The court having determined that the evidence should go to the jury, we fail to find any error of which the appellant can complain in the court allowing the jury to again pass upon the question of fact as to whether the confession was made under restraint or while in custody. To our minds, the effect of this course was to afford another opportunity to the accused to escape the effect of the confession of his guilt, had the jury concluded that he was in custody or under restraint when he made it. It was the province of the judge to decide upon the admissibility of the evidence of the confession; and, whilst he was not required to submit any question as to its admissibility to the jury, we are of opinion that if there was error it inured to the benefit, and not to the prejudice, of the appellant, and affords no just ground for reversal or appeal.

We have given to this question all the consideration its

importance would have demanded had the conviction depended alone upon the admission or exclusion of this confession.    Such, however, is not the case in fact; on the contrary, we are of opinion the evidence adduced was amply sufficient to warrant the verdict and judgment, independent of the confession.    The other assignments of error, and the several grounds set out in the motion for a new trial, have been carefully considered in the light of the whole case, as presented by the record, both the original and that brought up by *certiorari*, and, in the light of the able brief and oral argument of the appellant's counsel, without discovering any such irregularity as would warrant an interference with the judgment rendered in the court below.    As to the question raised as to the admissibility of certain statements made by the accused, whilst in custody, with regard to his uncle's hat, it is only necessary to say it is now too late for the appellant to complain, no bill of exceptions having been reserved to the admission of the testimony.    We fail, however, to see that any prejudice was shown the accused by the action of the court, either in admitting the testimony or in the instructions to the jury on that point.

The charge asked by the defendant and refused by the court was entirely unnecessary, the court having, in the main charge, given the jury proper instruction on the subject embraced in the charge which was refused.    The charge of the court, taken as a whole, was an able, accurate, and eminently fair enunciation of the law of the case, as we see it by the record.    The crime having been committed whilst the Constitution of 1869 was in force, and allowed it, the question whether, in case the jury should find the defendant guilty of murder in the first degree, they would impose imprisonment at hard labor for life in the penitentiary, in lieu of the death penalty, was submitted to the jury, and in their discretion, the jury, under the evidence before them, imposed the extreme penalty of the law, refusing to find

the milder punishment, and the court before whom the trial was had refused a new trial and adjudged the accused guilty of murder in the first degree, and imposed, under the law and the verdict of the jury, the penalty of death by hanging.

After a careful and patient investigation of the whole course of proceedings and the evidence, we are impressed with the fact that the appellant has been fairly and legally tried and convicted, upon a sufficient amount of competent and legal testimony, and that all the rights guaranteed him by law have been carefully guarded and duly observed. Under these circumstances, this court would be derelict in duty were it to shrink from the responsibility of affirming a just and legal judgment, however momentous the issue involved.

Finding no material error in the judgment of the District Court of McLennan County in this case, it is affirmed.

*Affirmed.*